IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>RICHARD LEE SHOOK,<br><br>    Defendant. | Case No. 1:12-CR-74-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion to suppress filed by defendant Shook. No hearing was held, as the parties stipulated to presenting the motion on the briefs. The Court has reviewed those briefs and the other material submitted by the parties. For the reasons explained below, the Court will grant the motion.

## FACTS

The defendant Richard Shook is charged with a single count of being a felon in possession of a firearm, a sawed-off shotgun found by police during a search of his home. He has filed a motion to suppress alleging that the warrantless search was improper and that the shotgun, and incriminating statements he made to police, should be excluded from evidence.

On February 17, 2011, at about 5:30 p.m., the Canyon County Sheriff's dispatcher received a 911 call from a cell phone. The call lasted about 5 seconds, but the caller said

nothing and then hung up. The call was traced to a specific address in Caldwell, and Detective Hessman and Officer Farnsworth were dispatched to that address.

When they arrived at the residence, they knocked on the door, and rang the doorbell. They heard a dog bark from within the house, but no one answered the door. As they stood at the front door, they saw a young man come walking toward them from the rear of the residence. When they notified him that they were there because of a 911 hang-up call, he said everything was ok, and explained that he did not answer the front door because he had just stepped out for a smoke. One of the officers asked him, "Where's the marijuana . . . .?" After Kolton explained he "didn't have any," the officer asked "[d]id you just get done smoking it?" Kolton answered "[n]o." *See Transcript (Dkt. No. 15-6) at p. 2.*[1]

The officers then asked Kolton, "How many of you are here now?" *Id*. at p. 3. When Kolton answered "Huh?", the officers asked, "Just the two of you?" Kolton responded, "Yeah I guess. I can go upstairs and get Buey," apparently referring to his brother's girlfriend who was upstairs. The officers asked him if these other occupants had locked him out and he said "yeah."

When the officers told him they had to clear the premises after getting the 911 call, Kolton began walking back toward the rear of the house with the officers accompanying him, then he reversed and said it would be better to go in the front door. When they

---

[1] Both officers were wearing microphones, and transcripts of their conversation with occupants of the residence were recorded and transcribed.

reached the front door, Kolton looked over his shoulder at Officer Farnsworth, reached for the door knob, and then slightly opened the front door and stated that he would be right back. He then tried to slide his body through the doorway while he held the door as close as possible to his body. At this point, the officers smelled the odor of burnt marijuana coming from inside, "even stronger than it was on the front porch," according to Detective Hessman. *See Report (Dkt. No. 15-4)*. The officers instructed Kolton that they were not going to allow him to go unescorted into the residence, and they followed him in.

After entering the residence, the officers encountered (1) a young man with a bong for smoking marijuana, and (2) the strong odor of marijuana. The officers again asked if others were in the house, and were told by Kolton that his brother's girlfriend was upstairs.

Detective Hessman then conducted a security sweep of the house. In an upstairs room, he found the sawed-off shotgun that forms the basis for the Indictment in this case. The defendant, the owner of the residence, was not home at the time, but later admitted to police that he possessed the shotgun.

The defendant now alleges that the search of his home was illegal, and he seeks to suppress the shotgun and his statements to the police.

## ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

Const. amend. IV. "Nowhere is the protective force of the Fourth Amendment more powerful than it is when the sanctity of the home is involved." *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 884 (9th Cir.1990). Accordingly, it is a "basic principle" of Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

This presumption may be overcome, however, if the government can show that the search falls within "one of a carefully defined set of exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971). The warrant requirement is subject to "certain reasonable exceptions" because the "touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011) (quotation marks and citation omitted).

The Government alleges that two exceptions apply here: (1) exigency and (2) emergency. "These exceptions are narrow and their boundaries are rigorously guarded to prevent any expansion that would unduly interfere with the sanctity of the home." *Sims v Stanton*, 706 F.3d 954, 960 (9th Cir. 2013).

The exigency exception assists officers in the performance of their law enforcement function. It permits police to commit a warrantless entry where "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.*

The emergency exception, in contrast, seeks to ensure that officers can carry out

their duties safely while at the same time ensuring the safety of members of the public. It applies when officers "have an objectively reasonable basis for concluding that there is an immediate need to protect others or themselves from serious harm." *Id.*

Under either exception, the Court must consider "the seriousness, or lack thereof, of the underlying offense." *Id*. In situations where the underlying offense is only a misdemeanor, "law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases." *Id.* at 961. For example, the Supreme Court has held that the exigency exception generally applies only to a fleeing felon and not to a fleeing misdemeanant. *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). On the basis of *Welsh*, "this Circuit has clearly held that an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home." *U.S. v. Struckman*, 603 F.3d 731, 745 (9th Cir. 2010). In *Hopkins v. Bonvicino*, 573 F.3d 752, 768–69 (9th Cir. 2009), the Circuit held that the need to obtain a blood sample from a person suspected of driving under the influence, a misdemeanor, before the alcohol in his blood dissipated, was insufficient to justify a warrantless home entry.

The government bears the burden of showing the existence of exigent circumstances by particularized evidence." *U.S. v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000). This is a "heavy burden" and can be satisfied "only by demonstrating specific and articulable facts to justify the finding of exigent circumstances." *Id*.

**Exigent Circumstances**

The Government claims that because Detective Hessman and Officer Farnsworth

smelled marijuana on the porch,

> they had probable cause to believe the crime of possession and use of marijuana was being committed by Kolton Shook and whoever else was inside the house. And they had a reasonable belief that their entry as law enforcement officers was needed to stop the destruction of evidence or to carry out crime-prevention.

*See Government's Brief* at p. 11.

The Court disagrees. *Reid* placed a "heavy burden" on the Government to prove the existence of exigent circumstances, and stated that "the smell of burning marijuana cannot satisfy the heavy burden that the government must overcome . . . ." *Reid*, 226 F.3d at 1028. The reason is that smoking marijuana and possessing its related paraphernalia are misdemeanors, as evidenced by the issuance of misdemeanor citations to the occupants of the residence for possession of a controlled substance and possession of drug paraphernalia. Smelling marijuana signals only that someone is smoking pot, a minor misdemeanor that cannot justify a warrantless home entry under the cases cited above.

**Emergency Circumstances**

The Government argues that the emergency circumstances exception applies because they received a 911 call that had been traced to Snook's residence. "[T]he police must take 911 emergency calls seriously and respond with dispatch." *U.S. v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004). Any delay "may prove costly to public safety and undermine the 911 system's usefulness." *Id*. Even when the 911 caller hangs up without providing any information, the police must respond. For example, if the

police had ignored the 911 hang-up call described in *U.S. v. Coleman*, 627 F.3d 205, 208 (6th Cir. 2010), they would have failed to rescue a woman being beaten by her boyfriend.

In the present case, the two officers were likewise presented with a 911 hang-up call, and properly responded by driving to the location identified as the source of the call.[2] Once at the home, the officers could investigate by examining the grounds around the home. *See U.S. v. Robbins*, 682 F.3d 1111 (8th Cir. 2012) (officers responding to 911 hang-up call properly seized evidence in plain view outside of home). They could go further and enter the home "without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' " *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam) (quoting *Brigham City*, 547 U.S. at 403). "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id*. at 549. Nor do officers need to wait for a potentially dangerous situation to escalate into public violence in order to intervene. *Id*. "[T]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Brigham City*, 547 U.S. at 406.

Here, the officers saw nothing at the residence that signaled danger. Their

---

[2] AT&T was the service provider for the cell phone that made the 911 call. The company provided a certification that the location of the call could have been anywhere within 233 feet of the address of defendant's residence. *See AT&T Response (Dkt. No. 15-10)*. An aerial photo shows that the homes in this neighborhood are close together, and the 233-foot margin of error means that the call could have originated from an entirely different address. *See GPS Map (Dkt. No. 15-3)*. Because the Court finds that the search was improper for other reasons, the Court renders no opinion on whether the identification of the caller's location was sufficiently precise to justify the officers responding to that particular residence.

**Memorandum Decision & Order - 7**

questioning of Kolton Snook, and their observations of the home, uncovered no evidence that their intervention was needed to protect an occupant of the home. The smell of marijuana meant that someone was smoking pot, not that someone needed to be rescued. The Government argues, however, that

> the 911 call raised reasonable concerns on the part of [the officers]which were not allayed by initial contact with Kolton Shook at [the residence]. Suspiciously, nobody answered their knocks or the doorbell; yet a dog barked, leaving them unconvinced that nobody was home. Then a young man came around to greet them from the back of the house, and gave conflicting accounts whether he went out for a smoke or was locked out by other occupants. This person could not convincingly assure them there was no need to be concerned about a 911 hang-up. The officers asked, "How many of you are here now?" Kolton Shook answered, "Huh?" The officers followed up, "Just the two of you?" And the answer by Kolton Shook was, "Yeah, I guess. I can go back upstairs and get Buey." The facts the officers found upon arriving at the location of the 911 [hang-up call] gave them objectively reasonable reasons for entering the premises.

*See Government's Brief (Dkt. No. 17)* at p. 13. The Court disagrees. There is nothing inherently suspicious about the quite common event of a dog barking in response to a doorbell and nobody answering the door. And there is nothing necessarily contradictory about Kolton's explanation that he went outside for a smoke and was locked out by others inside. As discussed above, the emergency exception is "narrow" and the officers must have "an objectively reasonable basis for concluding that there is an immediate need to protect others or themselves from serious harm." *Sims,* 706 F.3d at 960. Even given the heightened awareness the officers are entitled to have in answering a 911 hang-up call, this encounter gave rise to no basis for believing that an occupant in the home was in immediate need of protection from serious harm. At most, it gave rise to a solid suspicion

**Memorandum Decision & Order - 8**

that someone was smoking pot inside, not that someone needed to be rescued.

Because the officers uncovered nothing of an emergency nature after arriving at the house, their only possible justification for entering the home was the 911 hang-up call. Yet no case cited by the Government applies the emergency exception in such a situation, and the Court's own research uncovers no such case. Instead, the cases involving 911 hang-up calls where the emergency exception was found to exist include some additional factor that triggered the exception. For example, in *U.S. v. Najar* 451 F.3d 710 (10th Cir. 2006), a dispatcher returned a 911 hang-up call only to find that someone would pick up her call and then hang up without answering. The court held that the emergency exception applied because "[a] reasonable person could well be concerned that someone was trying to prevent communication with safety officials, not merely avoid it." *Id*. at 720. In *Johnson v. City of Memphis*, 617 F.3d 864 (6th Cir. 2010), the dispatcher received a hang-up 911 call and tried to return the call but got no answer. The police responded to the home where the call came from, and found an open door. The court approved the officers' entry into the home, finding that the emergency exception applied in that case. *Id*. at 869-70. The court noted that

> [i]f anything, a 911 hang-up call with an unanswered return call from the 911 dispatcher may present even more reason to believe that someone inside the residence is in immediate need of assistance. An unanswered 911 return call suggests that someone in the residence is injured or otherwise incapacitated so as to be unable to answer the return call.

*Id*. at 869 (quotations omitted). Neither *Najar* nor *Johnson* applies here because there is no evidence that the dispatcher attempted to return the call, and there is no other evidence

Memorandum Decision & Order - 9

that someone in the residence might be in immediate need of protection from serious harm.

The Court is not holding that a 911 hang-up call will never be sufficient to trigger the emergency exception; it is merely holding that in this case, the Government has not borne its "heavy burden" of presenting "particularized evidence" to justify the application of the emergency exception. *Reid*, 226 F.3d at 1028.[3]

**Conclusion**

The Court therefore finds that the Government has not carried its burden of demonstrating that any exception applies to the warrant requirement. Consequently, the Court will grant defendant Shook's motion to suppress the shotgun that was seized during the search of Shook's residence. Shook's incriminating statements are the result of that illegal search and hence must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. U.S.*, 371 U.S. 471, 484–87 (1963).

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to suppress

---

[3] Less indicative of an emergency is the 911 "static" call. Apparently, it is well-established that an electrical or weather anomaly can "place" a 911 call without a human caller, and the dispatcher will hear only static on the line. *See U.S. v. Martinez*, 642 F.3d 1292 (10th Cir. 2011). In *Martinez*, the court refused to apply the emergency exception when the only justification for the officers' entry into the home was a static 911 call. The court distinguished between a "hang-up" 911 call, that is at least dialed by a human who might be in distress, and a "static" call that is the result of weather. In the present case, there is no dispute that the 911 call was a hang-up call.

(docket no. 15) is GRANTED.



DATED:  **May 29, 2013**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order - 11**